El Pueblo de Puerto Rico, demandante y apelado, *v.* Zoilo Nieves Santiago, acusado y apelante.

Núm. 8312.—*Sometido:* Noviembre 14, 1940. *Resuelto:* Diciembre 19, 1940.

*Diego E. Ramos* y *Buenaventura Esteves,* abogados del apelante; *Hon. Procurador General George A. Malcolm* y *R. A. Gómez, Fiscal del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO emitió la opinión del tribunal.

El Fiscal del Distrito de Arecibo formuló acusación contra Zoilo Nieves, imputándole un delito de asesinato en primer grado cometido en Utuado el 17 de junio de 1937, en la persona de Pascual Nieves Camacho.

El acusado alegó que era inocente y solicitó juicio por jurado. El juicio se celebró en abril de 1939 y el Jurado rindió un veredicto de culpable de homicidio voluntario. Solicitado un nuevo juicio, fué negado, dictando la corte sentencia en mayo siguiente imponiendo al convicto siete años de presidio con trabajos forzados.

No conforme Zoilo Nieves, interpuso el presente recurso de apelación señalando en su alegato diez errores cometidos a su juicio por la corte al permitir al fiscal que rebajara la calificación del delito, al permitir al testigo Angelino Alvarez que declarara sobre manifestaciones que hiciera el interfecto horas antes del crimen, al permitir al testigo Juan B. Molina que declarara sobre hechos inmateriales, al prohibir a la defensa que interrogara a la testigo Camila Nieves, al intervenir indebidamente en el examen de los testigos, al prohibir a la defensa que presentara en evidencia ciertos autos sobre declaratoria de herederos y administración judicial, al negarse a trasmitir determinadas instrucciones al jurado y al trasmitir otras, y al declarar sin lugar la solicitud de nuevo juicio.

Parece conveniente comenzar analizando la evidencia que sirvió de base al veredicto. Tras ese análisis nos encontraremos en mejores condiciones para considerar y resolver los señalamientos de error.

El primer testigo que declaró fué el Dr. Miguel Peregrina. Practicó la autopsia de Pascual Nieves. Presentaba tres heridas de bala, una leve en la frente, otra grave pero no mortal en la boca y otra mortal por necesidad en la clavícula derecha, atravesando la aorta y el lóbulo inferior del pulmón izquierdo. La hemorragia interna tuvo que ser violenta y la muerte debió ocurrir de uno a dos minutos después de inferida la herida tercera.

Dijo además que fué llamado para asistir a una señora que se suponía que se había envenenado. Llegó a la casa donde había una excitación grandísima. Penetró en la habitación, examinó la enferma y ordenó que fuera trasladada al hospital al darse cuenta de la gravedad del caso. Eso fué como a las once de la noche del 16 de junio de 1937. En el hospital la atendió hasta las dos y media o tres de la mañana. Al salir del cuarto se enfrentó con el joven Armindo Nieves que le preguntó si su mamá estaba fuera de peligro. Le contestó que lamentaba decirle que era un caso perdido y entró a su oficina a dar instrucciones a la enfermera. Dos o tres minutos después sintió varios disparos sin que pueda precisar el número ni si los intervalos entre unos y otros fueron los mismos. A poco entró el conserje y le entregó dos revólveres que guardó. Cerró la puerta. Hizo que llamaran la Policía. Pascual Nieves, que cree era el esposo de la enferma, le pidió que tratara de salvarla, que por dinero no lo hiciera le dijo, como queriendo estimularlo. Al hospital fueron algunos familiares, entre ellos vió al principio al acusado, después no volvió a verlo, el acusado no fué el que le preguntó por el estado de la enferma.

Llamada Casimira Nieves, conocida por Camila, casada, de veinte y un años de edad, hermana del acusado, declaró que supo de la muerte de sus padres por los periódicos, es-

tando en Nueva York. Se trasladó a Puerto Rico yendo a vivir a la casa que fué de sus padres donde estaban varios de sus hermanos, entre ellos el acusado. Al día siguiente hallándose en su cuarto orando en memoria de su madre muerta, su hermano el acusado le dijo "que cuando mi madre estaba envenenada llamó a mi hermano Armindo y le dijo que si no mataba a mi padre lo mataba él y dijo que si lo mataba mi padre a él él mataría a mi padre . . . Cuando Zoilo dijo a Mindo eso le dijo Mindo que si mi padre lo mataba a él, Mindo, entonces Zoilo mataría a mi padre, y como quedaron en eso Mindo siguió donde estaba él y él se quedó atrás pero velando sus pasos y cuando Mindo entró donde estaba mi padre, que le dió el revólver, al poco rato llegó él y cuando llegó encontró a mi padre encima de Armindo, que le iba a dar, y como mi padre era fuerte, él con una mano le cogió la mano a mi padre con que le iba a dar y con la otra le tiró a él y lo mató, que fué el último tiro que lo mató a él y ése fué el que le dió él."

Repreguntada por la defensa sobre si tuvo disgustos con su hermano el acusado con motivo de un cafetín, contestó negativamente; sobre si tenía interés en que su hermano fuera condenado para que su porción hereditaria aumentara, respondió también negativamente; le pidió que explicara al Jurado por qué esperó más de cinco meses después de la confesión de su hermano para comunicársela al fiscal, y contestó: "Porque él no quería que yo dijera la verdad y siempre estaba peleando conmigo, . . . me amenazaba con darme, porque no quería que dijera la verdad, y no podía permitirlo y lo hice y dije la verdad"; insistió en que expresara cómo era "posible que un hombre se iba a oponer con tenacidad y se opuso, llegando hasta el extremo de amenazarla y pegarle porque viniera a delatarlo, espontáneamente fuera él mismo el que le hiciera esas manifestaciones", y la testigó contestó: "El salió de casa y cuando salió vine aquí y se lo dije al fiscal y cuando llegué a mi casa no estaba en casa y le dió coraje y me fué a dar y cuando me fué a dar el jefe

oyó las palabras: maté a mi padre y según maté a mi padre te mato a ti de aquí a la tarde.''

Manifestó la defensa que la testigo no había entendido su pregunta y la hizo de nuevo. La testigo contestó reafirmando que el acusado le había hecho la confesión. Otra vez insistió la defensa e intervino entonces la corte como sigue: ''Me parece eso es más bien de argumentar, porque no podría ella explicar esa actitud de él. Puede declarar sobre hechos y si son inverosímiles explicarlos al argumentar, pero ella no podría explicar los motivos que tuvo él.''

Roberto Edwin Nieves fué el siguiente testigo. Es un niño de doce años de edad. Declaró que cuando se llevaron a su mamá envenenada, fué al hospital con su papá y estando ambos en el cuarto con ella entró su hermano Mindo ''con dos revólveres y le dió uno a papá y le dijo: 'tenga éste y defiéndase', y papá haló el revólver y al abrirlo se cayeron las balas y entonces Mindo disparó dos tiros. Me metí debajo de la cama. Me quedé mirando y se le fué encima papá y Mindo disparó otro tiro y falló y salí para afuera del hospital.'' Vió al acusado que venía corriendo en una bicicleta cerca del hospital y después de verlo sintió otro disparo.

Angelino Hernández, cabo de la Policía Insular, dijo que en la noche del suceso el padre del acusado le manifestó que quería sacar de la casa a su esposa que estaba envenenada para que le prestaran auxilio y sus hijos armados de revólveres se oponían, y le contestó que ésos no eran asuntos de la policía, que fuera donde el Juez. Luego se decidió a ir a la casa y vió el carro en que llevaban la enferma para el hospital. Fué al hospital y vió que el acusado y su hermano Armindo Nieves ''se paseaban por el frente mientras el médico daba la asistencia a la señora y el padre estaba dentro.''

Aracelio Figueroa, policía insular, declaró que el 17 de junio de 1937 prestaba servicio como retén en el Cuartel de Utuado y como a la una y media el policía Molina llevó detenido a Armindo Nieves acusado de asesinato y su hermano Zoilo le pidió permiso para hablar con él. Se lo con-

cedió y Zoilo habló al oído con Armindo como dos minutos y le dijo que iba a buscarle fiadores, contestando Armindo que no los quería.

Juan B. Molina, el policía que llevó a Armindo al cuartel, depuso que como a las dos de la mañana salió para el hospital al enterarse de que pasaba algo allí y al acercarse se encontró con los hermanos Armindo y Zoilo Nieves.

Ofreció entonces el fiscal en evidencia una declaración escrita del acusado. Pidieron los abogados de éste diez minutos para examinarla, al cabo de los cuales manifestaron: "La admitimos sin oposición y hacemos nuestra esa declaración." Fué admitida. Es larga y confusa. Se prestó ante el fiscal el 23 de junio de 1939. De ella tomamos lo que sigue:

". . . en la noche del 17 de junio de 1937 . . . Armindo me dijo: 'Quédate cuidando la casa' . . . y estando en la calle pero frente a la casa . . . vió salir a Armindo de la tienda . . . y se fué a darle alcance . . . cuando yo subía bajaba el telegrafista, la señora, la hermana del telegrafista, me dijeron que por allí iba Mindo, que avanzara y lo alcanzaría y por más que avancé no pude alcanzarlo, entonces cuando sonaron las detonaciones yo estaba llegando al primer escalón del hospital . . . paré por el medio de la habitación . . . ya había pasado todo . . . mi hermano estaba abajo contra el armario, en el pasillito y papá encima; entonces yo vi que mi hermano tenía un revólver así como apuntando para arriba, yo rápido me le abalancé encima y le quité el revólver y mi papá que tenía el brazo detrás de él cayó para atrás, yo le cogí el revólver a cada uno y los puse sobre la mesa, vino Plumilla al ratito, mi hermano le dió los dos revólveres . . . y él se los entregó al Doctor Peregrina. —P.—¿Está seguro que el papá suyo tenía un revólver en ese momento?—Sí, señor.—P.—¿Descargado o cargado?—No me fijé.—P.— ¿Su hermano también tenía un revólver?—Sí, señor.—P.—¿Su hermano estaba debajo y su papá encima?—Sí, señor.—P.—¿Su papá lo tenía dominado?—Yo supongo porque estaba debajo.—P.—¿Estaban luchando ellos o no?—Sí, luchando."

Preguntado sobre si hizo o no la confesión de ser él el autor del último disparo, contestó en la negativa.

En relación con el envenenamiento de la madre y la actitud de Armindo y suya con respecto al padre declaró:

"P.—¿Antes de Armindo salir para el hospital Ud. habló con él? —Sí, señor.—P.—¿Dónde?—En la tienda.—P.—¿Qué conversación tuvo con él?—Yo le pregunté a él que qué era lo que le había dicho papá el día antes, que mamá estaba llorando; porque papá llamó a solas a Mindo y le contó algo; mi mamá se puso a escuchar y no se atrevía decirme a mí y lloraba; entonces fuí donde Mindo. '¿Qué te ha contado, Mindo?'—'Nada, no tengo que decirles a Uds. nada.' Pues al otro día cuando mamá se envenenó, le dije: 'Mindo, tú crees que yo no soy un hombre; yo soy capaz de guardar cualquier secreto; entonces tú me vas a decir lo que papá le dijo a usted;' entonces me dijo: 'Yo te voy a decir esto, pero no se lo digas a nadie: tú vete de casa; que si venden la casa; que mamá le había sido infiel'. Entonces yo le dije: 'Caramba, ésa es una cosa grandísima; una señora que nunca sale de casa y si nunca sale no hay oportunidad ninguna; que ha salido dos veces para en casa de tía y ha ido con Roberto Edwin y ha venido el mismo día y que va en casa del hermano de papá, de la hermana de él; así que eso es mentira; yo no creo eso.' Entonces fué cuando me dice: 'Bueno, está bien.' "

Niega que concertara con su hermano la muerte del padre.

Con la presentación de ese documento, terminó la evidencia del fiscal. Comenzó la de la defensa con la declaración de Iraida Medina, enfermera que asistió a la señora Nieves cuando la llevaron al hospital. Dijo que oyó los disparos pero no podía precisar su número ni si fueron corridos, uno detrás de otro. No sabe quién mató a don Pascual Nieves, ni quién hizo los disparos.

Vicenta Villalba, enfermera auxiliar, manifestó que vió al acusado en el hospital cuando trajeron a su mamá envenenada. Durante la tragedia no lo vió. Llegaría como cinco minutos después. Estaba llegando a la cocina del hospital cuando sintió los disparos. Los sintió corridos.

Inocencio Montalvo, depuso que el acusado tenía un cafetín al que entró Camila Nieves a provocarlo diciéndole que saliera de allí, que el acusado le contestó que se fuera a atender sus quehaceres arriba y ella le escupió la cara. Pregun-

tado si la hermana amenazó al acusado, contestó: "Ella dijo que lo iba a hacer ir a la cárcel, y Zoilo dijo: probaría eso si tiene prueba para hacerme ir a la cárcel." Al fiscal contestó que una hija suya estaba casada con el acusado.

Llamó entonces la defensa a Camila Nieves. Como tratara de hacerle preguntas sugestivas, la corte lo impidió y el acusado tomó excepción. Luego la testigo contestó que era casada desde hacía más o menos nueve meses. Tiene ocho hermanos. Cuando regresó a la isla Zoilo estaba al frente del cafetín. Cuando Zoilo fué arrestado dejó de existir el cafetín. Ella no lo administró. Visitó al acusado en la cárcel varias veces. No le ofreció ponerle abogado ni le dijo que estaba arrepentida. No lo está. Se enteró de que se tramitaba una declaratoria de herederos. Interrogada sobre cierta administración judicial, el fiscal admitió que instada la administración judicial de la herencia de los padres de la testigo por la hermana mayor de ésta, la testigo compareció, por su consejo, a oponerse, y se opuso a que continuara el interrogatorio por irrelevante, y por no ser materia de defensa. Sostuvo su oposición la corte, y la defensa tomó excepción. Trató entonces la defensa de presentar los autos originales relativos a la declaratoria de herederos, a la administración judicial y al proceso seguido contra el hermano del acusado, Armindo. La corte expresó que la manera de hacerlo era por medio de copias certificadas, y la defensa tomó excepción.

Llamado a declarar Juan Soto Afanador manifestó que en junio de 1937 era empleado del hospital de Utuado y en la noche del 16 al 17 de dicho mes, llevaron envenenada al hospital a la señora de don Pascual Nieves. La señora murió la misma noche. Estando en la cocina del hospital sintió un tiro. Fueron varios, pero de los demás no puede dar exacta cuenta. Armindo le entregó dos revólveres para que los entregara a la policía y dijera que él había matado a su padre. Vió juntos a Armindo y a Zoilo.

Polidor Santiago, guardia de penales, conoció en la cárcel al acusado y a sus hermanas quienes lo visitaban juntos y separadamente, llevándole frutas y dulces. No oyó lo que hablaban.

Higinio González, guardia de penales como el testigo anterior, declaró en igual sentido.

Armindo Nieves, actualmente en el Presidio Insular dijo que su mamá se llamaba Emilia Santiago Ortega, que se declaró culpable y fué condenado como autor del delito de asesinato en segundo grado cometido en la persona de Pascual Nieves, padre suyo, el 17 de junio de 1937, hecho ocurrido en una alcoba del Hospital Municipal de Utuado. A la pregunta de la defensa ''¿A qué obedeció esa actuación de usted?'', contestó:

''Señor Juez, caballeros del Jurado, letrados y demás miembros de la corte: El que está presente es hijo de una familia que se ve envuelta en la más temible de las tragedias. . . . Bien, el aspecto o motivos que indujeron a este acusado son de naturaleza tan honda y envuelven tales aspectos psicológicos, que este acusado no se encuentra capacitado para poder explicar a la corte y miembros del Jurado hasta qué punto pudieran aquellos motivos inducirle a cometer un delito de tal naturaleza. . . . La gravedad existe en . . . que se trataba de la muerte de mi querida madre, y este acusado entiende que aquellos motivos que le indujeron a cometer hostilidad fueron provocados por mi querido padre y el estado en que nos vimos envueltos todos los miembros de nuestra casa en una gran tensión nerviosa, (oyendo) los gritos agónicos, la misma naturaleza se tenía que conmover y este acusado perdió todo dominio. . . . Yo entonces tomé armas. . . . Dos. . . . Un revólver Colt y uno Smith. . . . Me dirigí al hospital. . . . Iba completamente solo. . . . Entregué las armas, una a mi padre y yo otra. . . . Entonces dije . . . que esperaba que me matara a mí o yo a él y tomando el arma él dispuesto a disparar y yo disparé también. . . . Se abalanzó y caimos al suelo y él cayó agarrado de mí.''

Y siguió contestando como sigue:

''¿Qué participación tomó este acusado Zoilo Nieves en esos hechos que nos ha relatado?—Ninguna en absoluto.—P.—¿La única actuación de él fué entrar, quitarlo y sacarlo debajo y coger las

armas y entregárselas y ponerlas Ud. sobre una silla y salir con Ud.?
—Sí, señor.—¿Tuvo oportunidad en algún momento de disparar con-
tra su padre?—No, señor.—P.—¿Ni lo aguantó y quitó el revólver
a Ud.?—Tampoco.—P.—¿En ningún momento su hermano ha hecho
ningún disparo?—En ningún momento.''

La repregunta fué muy extensa. De ella transcribimos
lo que sigue:

''P.—¿Recuerda si abrió el revólver y se cayeron las balas?— . . .
recuerdo que lo abrí para mirarlo si tenía balas y lo volví a cerrar.—
¿Y se cayeron las balas?—Eso no puedo precisar. Si veo que se le
caen las balas no hubiera disparado.—. . .—P.—¿Y Ud. disparó?—
Sí, señor.—P.—¿En seguida?—Sí, señor.—P.—¿Cuándo?—Al mi-
nuto.—P.—¿Tardó un minuto en hacer el primer disparo?—Tardé
algún tiempo.—P.—¿Para qué?—Para darle tiempo.—P.— ¿Tiempo a
qué?—Para que pudiera hacer lo mismo que yo, defenderse.—P.—
¿De manera que le quería dar tiempo para que lo matara a Ud.?—Sí,
señor.—P.—¿Él no disparó?—No tuvo tiempo.—P.—En qué queda-
mos: ¿le quería dar tiempo para que disparara, pero no tuvo tiempo?
—El instinto de conservación se impuso.— . . . —P.—¿Ud. le hizo
el primer disparo estando de pie él?—Sí, señor.—P.—¿Y qué hizo
él entonces?—Se fué hacia adelante.—P.—¿Hacia encima de Ud.?—
Sí, señor.—P.—¿Lo agarró a Ud?—. . . —P.—¿Dónde estaban cuando
eso?—En el recinto del hospital.—P.—¿En el cuarto donde estaba su
mamá y papá?—Sí, señor.—P.—¿Se quedaron todo el tiempo durante
los disparos o se movieron a algún sitio?—Nos movimos hacia la
parte afuera.—P.—¿Luchando?—Sí, señor.—P.—¿Pasaron de la
puerta?—Sí, señor.— . . . —P.—¿Estuvieron por el pasillo luchando?
—Sí, señor.—P.—¿Dónde hizo el segundo disparo?—En el mismo
cuarto.—P.—¿Y el tercero?—Allí mismo.—. . . —P.—¿Y está seguro
que en el pasillo no disparó ninguno?—No, señor.—P.—¿De manera
que después de su padre recibir todos los tiros que le hizo siguió
luchando con Ud., salieron del cuarto, atravesaron el pasillo y ca-
yeron allá, él encima de Ud.?—Sí, señor.

Llamada Leocadia Nieves, hermana del acusado, declaró
que su hermana Camila está en posesión de la herencia de-
jada por sus padres—una casa ''que los mejores tasadores
de Utuado creen que puede valer dos mil dólares''; que pidió
que le nombraran administradora de la herencia y el Juez

nombró interinamente a Camila; que ésta se negó a darle alojamiento en la casa; que "después vino como loca a decirme que me pedía perdón porque he sido una madre para ella y a rogarme que fuera con ella a donde Zoilo"; que fueron a verlo a la cárcel y allí Camila le dijo: "Zoilo, estoy arrepentida de haberte entregado a la justicia y estoy dispuesta a ayudarte y a buscarte un abogado; que ella actúa así, a la ligera . . . unas veces pide perdón y otras no, no sé por qué."

Julio Suárez Garriga, Fiscal del Distrito, declaró que formuló acusación contra Armindo Nieves por asesinato de Pascual Nieves imputándole haber inferido tres heridas a Pascual las mismas imputadas a Zoilo en la acusación que contra él formuló luego. Cuando formuló la acusación contra Armindo "tenía evidencia indiciaria, circunstancial en cuanto a Zoilo Nieves y después que declaró Camila Nieves tenía evidencia no sólo circunstancial sino directa. En otras palabras: si hubiera acusado a Zoilo Nieves hubiera sido sacado por hábeas corpus, porque había evidencia circunstancial, que no era suficiente para sostener un caso y después se completó con la confesión que hizo a su hermana y con su declaración posterior ante mí que corroboró en todas sus partes la confesión de su hermana excepto en el hecho de que él había disparado."

Anunció la defensa que había terminado su prueba y el fiscal que tenía contraprueba que introducir. Llamó a Camila Nieves, que a sus preguntas contestó: Que no visitó con su hermana Leocadia a su hermano el acusado en la cárcel, ni pidió a éste perdón en ocasión alguna, ni le prometió buscarle un abogado; que sólo vió a su dicha hermana una vez en fiscalía cuando le dijo que le desocupara un cuarto inmediatamente y le contestó que no podía, que tenía que esperar a que una de las personas que en él estaban lo dejara, que representaba la casa y no podía hacerlo de momento, que viste y da de comer a su hermanito más pequeño.

Tal, en resumen, la evidencia de este caso extraordinarió en verdad en los anales del crimen en nuestra Isla.

Examinemos ahora los errores señalados. Son diez como ya dijimos. Seguiremos en su estudio el orden en que se exponen y argumentan por el apelante en su alegato.

■ Por el primero se sostiene que la corte erró al permitir, con la oposición del acusado, que el fiscal rebajara la calificación del delito de asesinato en primer grado a asesinato en segundo grado, con sólo anunciarla oralmente después de comenzado el juicio.

Argumentándolo dice la defensa en su alegato:

"No discutimos el derecho que tiene el fiscal para rebajar la calificación de un delito de asesinato en primer grado a asesinato en segundo grado, pues claramente ello beneficia al acusado y éste no puede ni debe protestar de dicha rebaja. Lo que discutimos y condenamos es el procedimiento que se usó en este caso, que a nuestro juicio constituye una grave desviación de la justicia y del orden legal. El que un fiscal, ya comenzado el juicio, anuncie sin contar con la anuencia del juez y con la enérgica oposición de la defensa, 'que va a seguir el caso por asesinato en segundo grado,' cuando la acusación no ha sido enmendada y contiene todos los ingredientes de un delito de asesinato en primer grado, es, a nuestro juicio, un procedimiento fatal, ya que el documento que va, como fué en este caso a la consideración del jurado y que se llevó éste al cuarto de deliberaciones, es la acusación originalmente redactada por asesinato en primer grado. 30 C. J. 116."

Lo que los autos revelan es que llamada la causa para juicio las partes manifestaron que estaban listas e inmediatamente dijo el fiscal: "Anuncio que voy a seguir el caso por asesinato en segundo grado,"—la acusación se había formulado por asesinato en primer grado. Se opuso la defensa porque con ello se le privaba de cierto número de recusaciones perentorias, y la corte resolvió: "La corte deniega la moción, porque aún no ha comenzado la insaculación del Jurado y el fiscal antes del juicio tiene derecho y aun al comienzo del juicio, a rebajar la calificación de la acusación, pero no tendrá derecho a acusar por otro delito o por un

grado más alto, pero por un grado más bajo sí, porque es en beneficio del acusado.''

La defensa tomó excepción. Se procedió a la constitución del Jurado y terminada dijo el fiscal: ''Acepto el jurado'' y agregó la defensa: ''Acepto el jurado también.''

Al comenzar la sesión del día siguiente la defensa suscitó de nuevo la cuestión manifestando que quería exponer un motivo más de oposición consistente en que el procedimiento seguido había sido irregular porque lo procedente era que el fiscal con permiso de la corte hubiera archivado una nueva acusación a fin de que el acusado hubiera tenido la oportunidad de oponer reparos a la misma.

La corte instruyó al Jurado en ese momento, así:

''La corte instruye al Jurado y hace constar en el récord, que antes del juicio el fiscal puede rebajar la calificación en la forma que lo hizo en este caso, porque se trata únicamente de rebajar a un grado inferior y no se perjudica en nada al acusado, porque los hechos, que es lo importante, son los mismos en la acusación, siendo la única diferencia que en el asesinato en primer grado el fiscal tendría que probar deliberación mientras que en el segundo grado solamente tiene que probar malicia premeditada. Como esa rebaja en la acusación favorece al acusado y como el acusado estaba preparado no sólo para defenderse de un acto premeditado, sino también deliberado no hay perjuicio alguno, y es cosa corriente en los tribunales americanos el que se haga esa rebaja antes del juicio. Por tanto, la corte desea instruiros, que a juicio de la corte no hay error ninguno.''

La cita de Corpus Juris que contiene el alegato, nada específico dice que sostenga el argumento de la defensa. No creemos que fuera necesaria la formulación de una nueva acusación. Rebajado el grado, el delito quedaba comprendido dentro del imputado, y si no se pusieron reparos a la acusación como formulada, menos hubieran podido ponérsele como rebajada. En cuanto al número de recusaciones, se recordará que la defensa finalmente aceptó expresamente el jurado tal como quedó constituído.

En ausencia de cita alguna específica de ley o jurisprudencia en contrario y no habiéndose demostrado perjuicio para el acusado, resolvemos que no hubo error y que de existir no fué perjudicial.

■ Se basa el segundo señalamiento en que la corte erró al permitir declarar al testigo de cargo Angelino Alvarez, con la oposición del acusado, sobre manifestaciones que hiciera el interfecto horas antes del crimen, sin demostrarse que el acusado oyera esas manifestaciones.

Hemos examinado íntegra la declaración objetada, páginas 50 a 58 de la transcripción, y de ella puede deducirse perfectamente que las manifestaciones del interfecto al testigo fueron o pudieron ser oídas por el acusado. Cae, en tal virtud, por su base el señalamiento de error.

■ El tercer error carece de importancia. Se formula porque se permitió declarar al testigo J. B. Molina sobre hechos inmateriales. En realidad su declaración no es importante. Se limitó en resumen a situar al acusado y a su hermano Armindo cerca del hospital donde se cometió el crimen, en la noche en que fué perpetrado. No hubo error y de haberlo no fué perjudicial.

■ Los errores cuarto y quinto se argumentan conjuntamente. Por ellos se imputa a la corte sentenciadora parcialidad y prejuicio ''al prohibir a la defensa que interrogara a Camila Nieves'' y al ''intervenir indebidamente en el examen de los testigos.''

Con respecto al primer extremo lo que surge del récord—páginas 90 y 91—es que habiendo llamado la defensa a declarar a Camila Nieves como su propio testigo, al hacerle ciertas preguntas sugestivas intervino la corte y dijo a la defensa que no podía continuar por ese camino. La defensa anotó una excepción ''a la dirección del caso'' fundándose en la jurisprudencia establecida en *El Pueblo* v. *Acevedo,* 35 D.P.R. 966, a saber:

''Si bien el juez sentenciador, en el ejercicio de discreción, puede participar en el examen de los testigos, deberá hacerlo en forma

tal que lleve al jurado la impresión de que fué enteramente impar-
cial, y de modo que no aparezca como si fuera un defensor o favo-
reciera una de las partes.''

Quizá la corte debió esperar a que el fiscal interviniera.
Sin embargo, era tan manifiesto que la defensa comenzó a
dirigir su interrogatorio en forma improcedente, que su in-
tervención fué como algo natural, lógico, impuesto por las
mismas circunstancias. En tal virtud y no pudiendo dedu-
cirse parcialidad ni prejuicio algunos de su actuación, no
creemos que el error que pudiera haberse cometido sea per-
judicial.

■ En cuanto a la indebida intervención de la corte en
el examen de los testigos, examinada en su totalidad la trans-
cripción de la evidencia no creemos que se extralimitara en
momento alguno en el ejercicio de sus poderes.

■ Por el señalamiento octavo se sostiene que la corte
erró al trasmitir al jurado la siguiente instrucción:

''Ustedes pueden creer a un testigo, parte de una declaración y
no creer otra parte, si creen que en parte dijo verdad y en parte dijo
mentira. Antiguamente cuando un testigo decía mentira en parte
de su declaración no se le creía en el resto. La tendencia moderna
es que a veces un hombre declara y en parte dice verdad y en parte
dice mentira. La dificultad es no saber apreciar dónde está diciendo
la verdad y dónde dice mentira.''

Invoca el apelante el inciso tercero del artículo 162 de la
Ley de Evidencia (art. 524 del Código de Enjuiciamiento Ci-
vil, ed. 1933), que dice:

''Un testigo que hubiere faltado a la verdad en una parte de su
declaración, deberá ponerse en duda respecto a otras.''

Ese precepto no tiene el alcance que le atribuye el ape-
lante. Cuando el testigo falta a la verdad en una parte de
su declaración, deberá *ponerse en duda* el resto de la misma,
pero ello no quiere decir que debe rechazarse por completo.
El Jurado actuará con cautela sabiendo que no camina por
terreno firme, pero si en el ejercicio de su discreción se con-

vence de que el resto de la declaración es verdadero, puede tomarlo en consideración para rendir su veredicto.

La propia parte apelante finaliza su discusión del error con la siguiente cita:

"La máxima 'falsus in uno, falsus in omnibus,' no debe interpretarse como que autoriza a la corte a instruir que si un testigo falta a la verdad respecto de uno o más particulares, el jurado debe rechazar toda su declaración." *People* v. *Sprague,* 53 Cal. 494.

No hubo error. La instrucción impugnada se ajusta a la ley y a la jurisprudencia sobre el particular a que la misma se refiere.

■ Por el noveno señalamiento se imputa error a la corte al trasmitir al jurado esta otra instrucción:

"Yo doy instrucciones de homicidio en este caso, porque tanto la prueba del fiscal como la prueba de la defensa aceptan que el acusado llegó en momentos que había una lucha. Si el acusado no llevaba idea de matar a su padre cuando entró al hospital, pero se encontró allí la lucha y se mezcló en esa lucha y disparó, entonces, Señores del Jurado, si esa muerte fué ilegal, sería un homicidio si fué sin malicia y no tuviera justificación ninguna. Si disparó y a virtud de los disparos, estando vivo el padre, el padre murió por los disparos de él y por los que había recibido podríais dar un veredicto, porque puede ser un homicidio, si creyeren que se ha probado, si llegaran a esa conclusión, no meramente por buscar otro delito, por suposición, sino por lo que crean que ha pasado."

Se invoca la jurisprudencia de esta corte sentada como sigue:

"El que pueda estar comprendido en el delito mayor objeto de una acusación, no justifica al juez dictar instrucciones sobre un delito menor, a menos que haya alguna evidencia que pueda servir de base a un veredicto declarando al acusado culpable del mismo. Tal evidencia *se resolvió* que no la hay en el caso de autos." *Pueblo* v. *Andino,* 55 D.P.R. 71.

No hubo error. Contrario a lo que sucedió en el caso invocado, en éste se encuentra en los autos evidencia que justifica la instrucción.

■ En el señalamiento séptimo se levanta la cuestión de las instrucciones denegadas.

Muestran los autos que el acusado presentó a la corte un pliego conteniendo siete largas instrucciones para su trasmisión al jurado.

La corte dijo primero:

"La corte ordena que esta proposición de instrucciones se una al récord para caso de una apelación, porque la corte las va a denegar, por entender que gran parte de ellas las ha dado y en parte no se pueden dar en la forma que se piden."

Y luego añadió:

"La corte no da estas instrucciones al Jurado, porque parte de ellas están comprendidas en las que acaba de dar, y parte llevarían a confusión al Jurado por ser en ciertos puntos equivocadas."

Transcribir las instrucciones solicitadas y discutirlas una a una alargaría innecesariamente esta opinión de suyo demasiado extensa ya. Bastará decir que del examen que hemos hecho encontramos justificada a la corte sentenciadora en su actuación. Ella cubrió en sus propias instrucciones de manera comprensiva todo el campo de los hechos y la ley y las que se le pidieron y denegó si bien contienen principios aceptables están todas redactadas en forma tal que producen confusión o tienden indebidamente a favorecer la causa del acusado. Bajo tales circunstancias creemos que actuó derechamente la corte al negarse a trasmitirlas.

■ Resta sólo por considerar los señalamientos sexto y décimo que se argumentan conjuntamente en el alegato. Se imputa por ellos error a la corte sentenciadora al "prohibir a la defensa que produjera como prueba los autos de los casos civiles sobre declaratoria de herederos y sobre administración judicial relativos a las personas y bienes de los padres del acusado" y al "declarar sin lugar la moción de nuevo juicio."

Ya al resumir la prueba tuvimos ocasión de referirnos al incidente que motiva el sexto error. Creemos en efecto que

la corte erró al no admitir los originales de los expedientes de que se trata como tales, exigiendo en su lugar copias de los mismos. ¿Perjudicó con ello los derechos del acusado? Veámoslo.

Todo lo que dice en su alegato el apelante sobre la relación de los expedientes con el caso es:

"El propósito que teníamos al tratar de presentar dicha evidencia era el de impugnar la veracidad de la testigo Camila Nieves y dejar sentado el interés que ésta tenía en que su hermano Zoilo Nieves, aquí apelante, fuese convicto de un delito que ella se había inventado con el solo fin de que su referido hermano quedara desheredado por mor de las disposiciones contenidas en el Art. 830 del Código Civil de 1911, ya que de este modo aumentaría la cuota hereditaria correspondiente a dicha testigo."

Los expedientes no se han traído a esta Corte. Debieron elevarse como evidencia presentada y no admitida, a fin de que pudiéramos juzgar por nosotros mismos sobre su importancia. Aunque el fiscal no actuó en la forma clara y precisa que debió hacerlo, es lo cierto que cuando se trató de introducir en evidencia los expedientes, dijo: "Me opongo porque no es prueba de defensa ésa."

Además, a virtud de las preguntas que se hicieron a Camila y a Leocadia Nieves, de las admisiones del fiscal y de las manifestaciones e insinuaciones de la defensa, los jurados quedaron enterados de todo lo que la defensa deseaba que conocieran sobre el particular.

Y por último, si bien la corte erró al no permitir la presentación de los autos originales, es lo cierto que dió a la defensa la oportunidad de presentarlos en copias, suspendiendo la sesión y anunciando que si se pedía la certificación ordenaría al Secretario que la sacara inmediatamente, a lo que contestó la defensa: "Anunciamos que no vamos a pedir ninguna."

Se ve de todo lo expuesto que se quiere ahora inflar un error puramente formal que en realidad no tiene importancia, para pedir la revocación de la sentencia. No estando

convencidos de que exista el más leve perjuicio para el acusado, no accederemos a la petición.

De los varios motivos que contiene la solicitud de nuevo juicio, sólo se discute especialmente el quinto que se refiere a la suficiencia de la prueba. Los otros han sido discutidos y resueltos en contra del acusado involucrados en los correspondientes errores señalados como fundamento de la apelación.

Creemos que la prueba es suficiente. Es éste un caso raro, extraordinario, de suma gravedad. Se trata de caracteres exaltados, cuyas manifestaciones deben recibirse y juzgarse con cautela. Camila Nieves, la testigo que llevó al jurado la confesión del acusado, fué por él creída, y pudo serlo porque su testimonio aunque de naturaleza excepcional no puede sostenerse que sea inverosímil.

La actuación del acusado, la manera como describió a su hermana su intervención en la perpetración del crimen, están en armonía con el resto de la prueba que lo conecta con el mismo, explicándose perfectamente su negativa ulterior a reconocer su confesión y la actitud de su hermano ya condenado al asumir por entero la responsabilidad. Cuando el acusado habló a su hermana lo hizo espontáneamente, sin medir seguramente las consecuencias de sus palabras. Después, al darse cuenta exacta de esas consecuencias, no es ilógica su reacción. Y en cuanto al hermano condenado ¿no parece natural que estándolo ya tratara de salvar al acusado?

Se explica también perfectamente que Camila vacilara en comunicar a las autoridades la confidencia de su hermano. Actuó como un alma atormentada que al fin resuelve el conflicto de conciencia que la perturba siguiendo el camino de la verdad. Lo que sí resulta insostenible es que ideara una confesión de tan tremenda trascendencia como la que expuso primero al fiscal y sostuvo luego firmemente en la corte por virtud de la cual sería juzgado de parricidio su hermano, con el único propósito de acrecer en una sexta parte de una oc-

tava parte su porción en una herencia valorada en su totalidad en unos dos mil dólares.

Doce jurados la creyeron unánimemente, pesaron su testimonio y consideraron que unido al resto de la prueba demandaba un veredicto de culpabilidad y lo rindieron. Un juez letrado, el mismo que dirigió el juicio y tuvo oportunidad de ver y oír declarar a los testigos, negó la petición de nuevo juicio, considerando la evidencia suficiente. Ningún error substancial de derecho ha sido cometido. Bajo tales circunstancias, veredicto, resolución y sentencia deben subsistir.

*Procede la desestimación del recurso y la confirmación de la sentencia apelada.*